**Not For Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 04-2286

ROBENSON SEIDE,

Petitioner,

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lipez, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Harvey J. Bazile, with whom Bazile & Associates, were on brief, for petitioner.
Linda S. Wernery, Attorney, Office of Immigration Litigation, Civil Division, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, Dennis J. Dimsey, Attorney, and Christopher C. Wang, Attorney, Office of Immigration Litigation, were on brief, for respondent.

June 30, 2005

**STAHL, <u>Senior Circuit Judge</u>.**  Petitioner Robenson Seide ("Seide") seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming a denial of his application for asylum, withholding of removal, and relief under Article 3 of the Convention Against Torture ("CAT").[1]  Finding no error, we affirm.

## I.  Background

Seide is a native and citizen of Haiti.  On August 25, 2001, he attempted, albeit unsuccessfully, to use a United States passport that originally had been issued to another person to enter the United States.  Prior to seeking entry into the United States, Seide lived in Port-au-Prince, Haiti with his wife, whom he married in January 2001 and who still lives in Port-au-Prince.  Seide was born and grew up in Cavaillon, Haiti with his parents, two sisters, and a brother.  By August 2001, his parents and one sister lived in St. Martin and his brother lived in the Dominican Republic.[2]

In September 2001, the United States Immigration and Naturalization Service ("INS") initiated removal proceedings against Seide.[3]  At his removal hearing before an Immigration Judge

---

[1]The CAT's full name is the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.  Article 3 of the CAT was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (codified at 8 U.S.C. § 1231).

[2]Seide's other sister lived in the United States.

[3]The Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. §

-2-

("IJ"), Seide conceded removability but applied for relief in the form of asylum, withholding of removal, and relief under the CAT.

During the hearing, Seide testified that he came to the United States to escape adverse treatment that he faced as a result of his political activities.[4]  He claimed that he became involved in politics in Haiti in 1999 when he joined Rassemblement des Citoyens Patriotes ("RCP"), an organization devoted to pursuing social and political reform in Haiti.  He also said that he was a member of Organisation des Militants Kavayone ("ODMK"), a group that sought to bring about reform in Cavaillon.  Seide routinely traveled from his home in Port-au-Prince to Cavaillon.

Seide maintained that due to his reformist activities, he began to experience adverse treatment in May 2000.  He recounted that on May 22, 2000, he was in the headquarters of RCP when the building was shot at and invaded by supporters of the Lavalas Party, Haiti's ruling political party.  Seide averred that the intruders killed one member of RCP, wounded fifteen to twenty others, and stole documents that contained names and addresses of RCP members.

---

291(a)), abolished the INS as an independent agency and transferred many of its duties to a bureau of the Department of Homeland Security.

[4]The following account is derived from Seide's removal hearing testimony and from his affidavit in support of his application for relief from removal.

Seide further testified that on July 14, 2000, four men wearing shirts bearing the logo of the Lavalas Party broke into his home while he was out, asked his servant for him by name, and stole, among other things, his passport. The intruders allegedly promised to return when he was in residence. Approximately two weeks later, Seide obtained a replacement passport. After the break-in, Seide vacated his home and, for several months, stayed with friends and family in various locations within Port-au-Prince. Then, in January 2001, he married and reestablished a permanent home with his wife in Port-au-Prince. Throughout this time, Seide continued to travel between and conduct political activities in Port-au-Prince and Cavaillon.

Next, Seide claimed that on November 25, 2000, he was attending mass in a church near Cavaillon with members of ODMK when a group of men brandishing firearms entered the church and ordered everyone inside to the ground. The mayor of Cavaillon, a member of the Lavalas Party, was allegedly among the intruders. Seide stated that he was physically attacked (though he did not require medical treatment) and ordered to cease his political activities.

Seide further insisted that two months later, in January 2001, the coordinator of ODMK was arrested and held in custody for a little over two weeks without being formally charged of a crime. The coordinator allegedly died soon after his release due to

injuries he sustained while in custody.  Seide acknowledged that while living in Haiti, he was never similarly detained.

Seide also recounted that on August 4, 2001, while driving a relative's car (a car he had previously driven on only a few occasions), he was followed and shot at by individuals in another car.  He asserted that he managed to escape on foot after losing control of the car.  Seide could not identify his attackers.  Moreover, although he indicated in his written affidavit that, as he ran away, his attackers yelled political epithets at him, he did not include this detail in his testimony before the IJ.

After considering all of the above, the IJ concluded that Seide had failed to establish an entitlement to the relief that he sought.  She refused his request for asylum, finding that he did not have a well-founded fear of future persecution in Haiti on account of his political beliefs and that he had not established that his departure from Haiti was caused by any prior politically-motivated incidents. As to the August 2001 attack, the IJ found it significant that Seide was driving a borrowed car, could not identify his attackers, and did not testify that his attackers yelled political epithets at him.  She concluded that there was insufficient evidence that he was the intended target of a politically-motivated attack and that, given the circumstances, he could not reasonably have viewed himself as the intended target of such an attack.  Further, she noted that the most recent of the

other incidents occurred nine months before he left Haiti.[5]  From this, she reasoned that Seide did not have a well-founded fear of future persecution and that his attempt to enter the United States was not "on account of threats . . . or mistreatment that he received [due to] his political activities"; it was "a matter of choice and not necessity."

The IJ then denied Seide's request for withholding of removal because she found that he had "failed to establish a clear probability of persecution" on account of his political beliefs if he were returned to Haiti.  Finally, she determined that Seide had not shown that "the authorities would . . . subject him to torture" if he were to return to Haiti, and thus, she denied his request for relief under the CAT.

Seide appealed the IJ's decision to the BIA.  After the BIA adopted and affirmed the IJ's ruling, Seide filed this timely appeal.

---

[5]The IJ also found it significant that Seide applied for and received a replacement passport immediately after the home invasion; at all relevant times, he traveled between and engaged in political activities in Port-au-Prince and Cavaillon; from January to August 2001, he lived without incident with his wife in a permanent home in Port-au-Prince; and he used another person's passport to try to enter the United States rather than using his own passport to legally gain access to St. Martin (where his parents and one sister lived) or the Dominican Republic (where his brother lived).

## II.  Discussion

We uphold decisions of the BIA if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted).  This standard applies to claims for asylum, withholding of removal, and relief under the CAT.  Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004).  "We will reverse only if the petitioner's evidence would compel a reasonable factfinder to conclude that relief was warranted."  Id.

Ordinarily, we review decisions of the BIA, and not those of an IJ.  See Njenga v. Ashcroft, 386 F.3d 335, 338 (1st Cir. 2004).  But, if, as in this case, the BIA has adopted the opinion of an IJ, then we must look to that decision instead and "treat the findings and conclusion of the IJ as the [BIA's] own opinion."  Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003).

A.      Asylum

An asylum applicant bears the burden of proving that he "is unable or unwilling to return to [his country of nationality] . . . because of [past] persecution or a well-founded fear of [future] persecution on account of . . . political opinion."  8 U.S.C. § 1101(a)(42)(A); see 8 C.F.R. § 208.13(a).  A showing of past persecution entitles the applicant to a rebuttable presumption of a well-founded fear of future persecution.  See Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir. 2004).  To carry his burden,

Seide had to show that he left Haiti for the United States because he faced past persecution or had a well-founded fear of future persecution as a result of his political beliefs.[6] See id. Still, if he demonstrated only past persecution and the government was able to rebut the presumption of a well-founded fear of future persecution, he would not have been entitled to asylum. See id.

The IJ found that Seide was ineligible for asylum because he established only past persecution and the government succeeded in rebutting the presumption of a well-founded fear of future persecution, and he did not prove that his departure from Haiti was caused by the past persecution. Because the evidence does not "compel" that we reach a conclusion different from that of the IJ, we affirm. See Settenda, 377 F.3d at 93.

Were it clear that Seide was the intended target of the August 2001 automobile attack and that he was targeted because of his political beliefs, this might be a more compelling case. But, we cannot say that the evidence necessitated the conclusion that Seide was, or that he reasonably could have viewed himself as, the intended target of a politically-motivated attack in August 2001, given that he could not identify his attackers, did not testify

---

[6]To show past persecution, Seide had to provide "conclusive evidence" that he was targeted because of his political opinions. Ali v. Gonzales, 401 F.3d 11, 15 (1st Cir. 2005). And, to show a well-founded fear of future persecution, he had to establish that his "fear [was] both genuine and objectively reasonable." Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999).

that his attackers yelled political epithets at him, and at the time of the attack, was driving a borrowed vehicle. Moreover, the November 2000 incident, the most recent of the other incidents, occurred nine months before Seide left Haiti. And, during that period, Seide lived openly with his wife in Port-au-Prince and continued to travel between and engage in political activities in Port-au-Prince and Cavaillon. Thus, there is sufficient evidence to support the IJ's finding that Seide was not the intended target of a politically-motivated attack in August 2001; the incidents of May, July, and November 2000 cannot fairly be viewed as the cause of his August 2001 departure; and, despite those incidents, he did not have a well-founded fear of future persecution on account of his political beliefs in August 2001.[7]

B.        Withholding of Removal

Because Seide failed to demonstrate his eligibility for asylum, he is necessarily ineligible for withholding of removal.

---

[7]Although we view the delay between the incidents in 2000 and Seide's departure in August 2001 as significant to the asylum determination, our decision is informed by a number of other factors as well. In particular, we find it noteworthy that Seide's wife currently lives peacefully in Port-au-Prince; in all of Seide's allegedly violent encounters with members of the Lavalas Party, he was never injured to the point where he required medical attention; and he used another person's passport to try to enter the United States rather using his own passport to legally gain access to St. Martin or the Dominican Republic (which supports the IJ's conclusion that his seeking to enter the United States was "a matter of choice and not necessity"). Moreover, if Seide truly feared that supporters of the Lavalas Party were out to harm him after the July 2000 home invasion, he probably would not have immediately applied to the authorities for a replacement passport.

See Mediouni v. INS, 314 F.3d 24, 27 (1st Cir. 2002) ("Because the standard for withholding . . . is more stringent than that for asylum, a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." (internal quotation marks omitted)). For this reason, the denial of his request for withholding of removal is affirmed.

C.        Convention Against Torture

An applicant seeking relief under the CAT must "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). For an act to constitute torture, it must be, inter alia, inflicted "by or at the instigation of or with the consent or acquiescence of a public official." Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004); see 8 C.F.R. § 208.18(a)(1).

There is sufficient support for the IJ's conclusion that Seide failed to establish that "it is more likely than not" that he will be tortured if returned to Haiti. As we have said, the evidence indicates that from January to August 2001, Seide lived openly in Port-au-Prince and traveled between and engaged in political activities in Port-au-Prince and Cavaillon. It also supports the IJ's finding that, during this time, Seide was not specifically targeted by any individuals, much less individuals associated with the government. The denial of Seide's request for relief under the CAT is affirmed.

**Affirmed.**