**Not For Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 04-2090

ABDUL KIGOZI,

Petitioner,

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Lipez and Howard,
Circuit Judges.

Abdul Kigozi on brief pro se.
Peter D. Keisler, Assistant Attorney General, Civil Division, Christopher C. Fuller, Senior Litigation Counsel, and Janice K. Redfern, Attorney, Office of Immigration Litigation, on brief for respondent.

September 8, 2005

**Per Curiam**.    Petitioner Abdul Kigozi, a native and citizen of Uganda, seeks review of an order of the Board of Immigration Appeals (BIA) summarily affirming a decision of an Immigration Judge (IJ).  The IJ denied requests for three forms of relief: asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  We lack jurisdiction to review either the asylum claim (because it was dismissed as untimely) or the CAT claim (because it was not pursued before the BIA).  Our merits review is accordingly confined to the claim for withholding.  Having found substantial evidence supporting the denial of that request, we deny the petition for review.

The general rule, subject to certain exceptions, is that an asylum claim must be filed within one year of an alien's arrival in this country.  See 8 U.S.C. § 1158(a)(2)(B).  Petitioner, who arrived on November 17, 1999, missed this deadline by at least eight months.  To overcome this default, he sought to invoke an exception that applies when "extraordinary circumstances" have contributed to the delay in filing.  Id. § 1158(a)(2)(D).  In one respect, petitioner had a colorable (if unfortunate) argument: several weeks before the deadline expired, he had been diagnosed with both HIV and tuberculosis and had been temporarily quarantined.  Yet the IJ deemed the exception inapplicable because petitioner had unjustifiably waited until the eleventh hour to initiate the application process.  Petitioner's challenge to this

ruling necessarily fails, inasmuch as we lack jurisdiction to review it. By statute, "'[n]o court shall have jurisdiction to review any determination of the Attorney General' concerning whether an applicant for asylum filed an untimely application or qualifies for the exception to the filing requirement." Njenga v. Ashcroft, 386 F.3d 335, 339 (1st Cir. 2004) (quoting 8 U.S.C. § 1158(a)(3)); accord, e.g., Sharari v. Gonzales, 407 F.3d 467, 473 (1st Cir. 2005).

We also lack jurisdiction to review petitioner's CAT claim, due to his failure to pursue it before the BIA. In neither his notice of appeal nor his brief to the BIA did he make any reference to this claim. Exhaustion of administrative remedies is statutorily mandated, see 8 U.S.C. § 1252(d)(1), and is a jurisdictional requirement, see, e.g., Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005); Sousa v. INS, 226 F.3d 28, 31-32 & n.3 (1st Cir. 2000). Accordingly, "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review." Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004). This rule applies even where, as here, the BIA has summarily affirmed and we are thus reviewing the IJ's decision. See, e.g., Un, 415 F.3d at 210-11 (declining to consider CAT claim); Olujoke v. Gonzales, 411 F.3d 16, 22-23 (1st Cir. 2005) (same). We add that petitioner's challenge in this regard would likely fail on the merits in any event, as the following discussion suggests.

This leaves petitioner's claim for withholding of removal under 8 U.S.C. § 1231(b)(3). To obtain such relief, petitioner must show that, if removed, "he is more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Sharari, 407 F.3d at 474. He can do so in either of two ways: (i) by showing that he has suffered such persecution in the past, thereby creating a rebuttable presumption of its recurrence; or (ii) by showing that it is more likely than not that he will suffer such persecution in the future, i.e., that he has a well-founded fear thereof which is both subjectively genuine and objectively reasonable. See, e.g., Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005). We review the agency's findings for substantial evidence and will reverse only if the evidence "would compel a reasonable factfinder to make a contrary determination." Id. at 5 (quoting Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999), and citing 8 U.S.C. § 1252(b)(4)(B)).

The evidence pertinent to this claim can be briefly recounted. Petitioner's fear of persecution stems from his political activities in Uganda between 1988 and 1994. During that time, first as a college student and then as an instructor, he was involved with an organization called the "Allied Democratic Forces" (ADF)--a rebel group opposed to the policies of the governing

-4-

regime. Petitioner served as a recruiter and attended clandestine meetings. His father was also a supporter.

In July 1994, petitioner was seized by armed men and taken to a military prison, where he was detained for at least nine days. He was there questioned about the ADF's operations, was physically abused on a regular basis, and was seriously beaten at least twice, suffering internal injuries and a lost tooth in the process. He was then released without explanation or charges. Within weeks, petitioner was summarily fired from his two government-affiliated jobs (as bank researcher and university lecturer), for reasons that he suspected were connected to his ADF activity.

For nearly three years thereafter, petitioner remained in Uganda in the same geographical location as before. Various family members lived with or near him, including his parents, his two young children, and his girlfriend (who was also the mother of his children). Unable to find work, allegedly because his arrest had saddled him with an "anti-government" reputation, he was forced to rely on savings and friends. Petitioner suffered no further physical abuse during this period but continued to be questioned occasionally, even though he had ceased all political activity after his detention. He asserted that such questioning amounted to "psychological torture" but did not elaborate.

In March 1997 petitioner moved to South Africa, where he obtained a teaching position.  He decided to leave Uganda, he testified, because the questioning of him had "intensified" and people had started "disappearing."  At some point in 1998, he began receiving anonymous telephone calls from individuals with Ugandan accents who accused him of continuing to support the ADF.  As a result, petitioner relocated to Namibia in February 1999, where he secured another teaching job.  Despite his efforts to conceal his whereabouts, the anonymous calls resumed in June or July of that year, numbering about three per month.  And they grew more ominous, warning petitioner that "wh[er]ever you go we're following you and we will get you."  Petitioner again packed up and, with a visitor's visa, arrived in the United States in November 1999.

Petitioner's family members, meanwhile, have remained in Uganda.  Several months after petitioner's departure, his father was questioned about his whereabouts; the same thing happened in December 1999 after petitioner had left Namibia.  Otherwise, none of petitioner's family members have been harassed on account of his ADF involvement.  Petitioner also testified that his father in 1996 was himself accused of being an ADF sympathizer, but that nothing came of the incident.

While we do not minimize the mistreatment involved here, cf. Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005) ("any beating at the hands of the police is one beating too many"), we

-6-

cannot say that this evidence compels a conclusion contrary to that reached below.  As did the IJ, we think it significant that petitioner ceased all political activity following his 1994 detention; that he was able to travel in and out of the country in 1997 without difficulty; that during the 32 months between his detention and his departure, he remained in the same geographical location without suffering further harm; and that his family members, including his ADF-sympathizing father, have continued to reside in that area without serious incident.  Moreover, in response to comparable accounts of physical abuse, this court and others have upheld denials of relief, even in the more lenient asylum context.  See, e.g., id. (collecting cases and describing as important factor "whether the mistreatment can be said to be systematic rather than reflective of a series of isolated incidents").  We also note that the circumstances here are sufficiently distinguishable from those in our recent Un decision to avoid the concerns raised there (which petitioner has not voiced in any event).  See 415 F.3d at 208-10.

The petition for review is denied.  The motion for stay of removal is denied as moot.